Anonymous, Petitioner, *v.* Four Anonymous, Respondents.

Domestic Relations Court of New York, Family Court, Bronx County, February 20, 1940.

*Stanley Faulkner,* for the petitioner and the respondent No. 3.

*Harry Katzenberg,* for the respondent No. 4.

SICHER, J. The petition was duly filed in behalf of Mrs. X by her daughter as next friend pursuant to section 111 of Domestic Relations Court Act of the City of New York.

Petitioner is upwards of seventy-three years old and for several years has been under medical care for a complication of infirmities. It is conceded by the parties, and confirmed by the probation department investigation, that her physical condition is such that she is unable to come to court to file the petition personally or attend any hearing.

Respondents are her four children, namely, that daughter (F.) and three adult sons (S., A. and J.), designated herein respectively as respondent No. 3, respondent No. 1, respondent No. 2 and respondent No. 4.

On consent of all the other parties this matter has been " reserved generally " against respondent No. 1, because of his limited financial and physical ability. Moreover, it appears from the probation department investigation report that he has been making direct payments to his mother when he can, amounting to about three dollars a month, is fond of her, and would like to and will help her more if possible.

Respondent No. 2 is also on good terms with his mother and sister and has been making direct payments of five dollars a month and, in addition, occasionally assuming doctors' bills.

Indeed, the sole occasion for invoking the intervention of this court is to cause respondent No. 4 to assist his aged and grievously ill mother. That was clearly shown by the January 17 and January 31, 1940, testimony. It further appears from the old lady's October 18, 1939, affidavit (authorizing the filing of the petition) and from the probation officer's report of an interview with her on November 4, 1939, at the daughter's home, namely: "She began to cry and said she knows S. [respondent No. 1] and A. [respondent No. 2] do the best they can and she is very grateful to F. [respondent No. 3] for her care but J. [respondent No. 4] is an unfeeling son and can easily afford to contribute something. She feels he has been very cruel and can give her money so she wouldn't be such a burden on F. [respondent No. 3]. Petitioner could not be questioned very much because of her illness."

I am loath to believe that respondent No. 4 is callously indifferent to his mother. He testified that he visited her at Lincoln Hospital

in December, 1939, and that after her death he will say for her " kaddish " (the traditional Hebrew mourning prayer of a son for his parent). So, from my observation of the parties I prefer to conclude that respondent No. 4's seemingly heartless attitude is motivated by an overpowering hostility to his sister and his belief that she has stripped the mother of her property and that any contribution by him now would be merely adding to what he considers the ill-gotten spoils of a grasping sister.

The weight of the conflicting evidence is against the validity of such belief.

Although not producing specific receipts, respondent No. 3 testified with some particularity that the doctors' and hospital expenses of the mother's protracted illness (including a paralytic stroke) had used up and exceeded the moneys which the mother received upon the father's death in 1932 and also sums subsequently derived from a personal injury suit and a daughter's small estate.

I accord greater credence also to the sister's evidence as to the negligible value of any remaining jewelry. Respondent No. 4 contended that at one time the mother possessed various pieces itemized in a list prepared by him from his recollection of the period, upwards of fifteen years ago, when he lived with his mother. The sister expressly disclaimed knowledge of the existence or the present whereabouts of any such claimed items, except a few trifling pieces produced by her at the January 17, 1940, hearing or accounted for as having been pawned to raise cash for medical and other expenses of the mother's long illness. No useful purpose would be served by narrating other details of the evidence concerning that jewelry. Suffice it that I am satisfied, and hold, that the value of any such still remaining property is now insignificant and quite inadequate to maintain the mother beyond a very short space of time.

I find also in favor of the sister's version as to the circumstances of her acquisition of the V. avenue premises and the cost of carrying it and the consequent annual deficits of net income (apart from the offsetting rental value of the apartment occupied by respondent No. 3, with her husband, son and mother).

Moreover, even assuming, for argument, the truth of respondent No. 4's assertion that his sister has systematically stripped the mother of property which would otherwise be now available to the mother for self-support, that asserted circumstance tends to establish, rather than to refute, that she is *now* " a dependent adult without means to maintain " herself and, therefore, " presumed to be likely to become a public charge." (Dom. Rel. Ct. Act, § 131.) For the test is whether or not the alleged dependent *herself* is *presently* possessed of means.

It is undisputed that the mother is physically unable to earn a livelihood by her own personal efforts. (Cf. *City of New York* v. *Wasserman*, 196 N. Y. Supp. 325.)

Accordingly, being without the ability or means to maintain herself, she is " likely to become a public charge," within the meaning of subdivision 4 of section 101 of the Domestic Relations Court Act, unless the statutory presumption to that effect must be adjudged overcome by the evidence showing that respondent No. 3's devotion is so deep that even without any help from respondent No. 4 she would doubtless continue housing, feeding and nursing the mother until the latter's death.

I cannot conceive that the statute requires so inequitable an inference to be drawn from a devoted daughter's voluntary discharge of more than her ratable share of the duty of support cast *severally* upon *all* four children and apportionable among them " as may be just and appropriate in view of the circumstances of the case and their respective means." (Dom. Rel. Ct. Act, § 101, subd. 4.)

True, the " public charge " clause in the United States Immigration Act has been construed to embrace only persons " whose support and care is provided at the expense of the public " (see *Matter of Kichmiriantz*, 283 Fed. 697; *Matter of Mitchell*, 256 id. 229; *Gegiow* v. *Uhl*, 239 U. S. 3); and protection of the public purse was the sole objective of the criminal enactments from which stem the broader civil law provisions of Domestic Relations Court Act of the City of New York governing the instant proceeding. (Cf. *Goetting* v. *Normoyle*, 191 N. Y. 368.) But under the statute here applicable a petitioner need not be actually a public charge; it is enough that there be the likely possibility of her becoming one. Surely, it cannot be a condition precedent to apportionment of the statutory burden that the daughter F. (respondent No. 3) must first discontinue her voluntary contributions, dump the ailing mother into a charity ward of some public hospital, and, like her brother J. (respondent No. 4), withhold her ratable share of aid until compelled by order of this court.

" The law does not stand upon punctilios if there is a starving wife at home." (Chief Judge CARDOZO, in *Coler* v. *Corn Exchange Bank*, 250 N. Y. 136, 143.) That humane principle applies equally to a needy mother.

It remains only to determine the contributions of the respective parties.

For the reasons above stated this proceeding has been reserved generally against respondent No. 1 (S).

This proceeding is also hereby reserved generally against respondent No. 3 (F.) as long as she continues to provide for the mother in

her home. (See *Canfield* v. *Canfield*, 118 N. Y. Supp. 530, 532; cf. *DePuy* v. *Cook*, 90 Hun, 43.) She resides in a three-family house owned by her; she has only one child, and her husband's earnings as a taxicab driver are supplemented by her own efforts as a marriage broker. However, her testimony shows still unpaid heavy bills for doctors and nursing and debts incurred because of the mother's sickness. Besides, even assuming that she is better circumstanced than her brothers, the lodging, feeding and constant loving care of her invalid mother outweigh in value the money contributions which respondents Nos. 2 and 4 are hereby being ordered to make.

Respondent No. 2 (A.) concededly earns forty-five dollars a week as a bookkeeper and his only child is now an adult in medical school. But the investigation report indicates that his wife is unwell, that he has current debts and that his home was recently taken over by Home Owners' Loan Corporation. Nevertheless, as above stated, he has been making direct payments of five dollars a month and, in addition, assuming certain doctors' bills. He is hereby ordered to pay for the support of his mother the sum of three dollars weekly each and every week, beginning on February 26, 1940, until further order of the court; but, in view of his friendly relations with petitioner and mother, those payments may be made direct to petitioner, subject to petitioner's right at any time to apply, without further notice, for a modification of this order so as to provide for payments by respondent No. 2 into court instead of direct to petitioner.

Respondent No. 4 (J.) is hereby ordered and directed to pay into this court the sum of three dollars weekly, each and every week, beginning on February 26, 1940, for the support of his mother, until further order of the court, and collectible by the petitioner in the mother's behalf.

The extent of respondent **No. 4's** means is somewhat vague. He was unco-operative with the probation department and defiant and evasive in the hearings before the court. But at least he admits that for upwards of thirty years he has been a union fur cutter, varying between first and second class, and that the union scale of wages for the former class is sixty dollars a week and for the latter fifty-five dollars a week. Because of non-co-operation it was impossible to procure the customary earning statement forms from employers. But the court will take judicial notice of the fact that the fur trade is seasonal. However, I do not believe this respondent's testimony that his earnings amounted to an average of only thirty dollars a week for the calendar year 1939, for his scale of living is beyond that income and indicates additional

resources. For example, he admits to owning and operating a fully-paid 1938 Chevrolet car solely for pleasure; he also carries $10,000 life insurance; and he concedes that his wife occasionally hires a servant. The running of that car involves garage and gasoline and oil bills, although he claims to carry no liability insurance (saying, first, that he was a careful driver, and, when the court commented that an accident might, nevertheless, happen, merely shrugging his shoulders and remarking that many people drive automobiles without insurance).

I find, therefore, that respondent No. 4 has not overcome the statutory presumption that a " respondent shall be deemed to be of sufficient financial ability to contribute to " a dependent adult's " support unless the contrary shall affirmatively appear to the satisfaction of the court or a justice thereof." (Dom. Rel. Ct. Act, § 92, subd. 9.) If need be, he can comply with today's order by cutting down or dispensing with the use of his pleasure automobile.

I have prepared this lengthy memorandum primarily for the parties themselves in the faint hope that respondent No. 3 and respondent No. 4 may be moved to compose their personal differences or at least declare a truce during the mother's lifetime. It is not within the power of this court to force a filial attitude nor to compel payment of an amount fully adequate for all the comforts essential to the mother's age and precarious condition.

" No friendly relationships can ever be maintained upon a strictly legal basis. * * * This would be a strange world if people were no better than the law allows. * * * Society and the home are preserved not by law but by an instinctive as well as educated regard for the moral rights of others." (CRANE, J., in *Field* v. *Field*, 79 Misc. 557, 558.)

So I appeal to the better nature of the parties and earnestly urge that they effect a family peace and a more generous financial arrangement out of court. Meanwhile, pending such amicable settlement, the foregoing order must be obeyed.

Four copies of this memorandum are being filed with the original, and the clerk of this court is hereby directed to mail or deliver one copy to the attorney for petitioner, one copy to the attorney for respondent No. 4, one copy to respondent No. 3, and one copy to respondent No. 2.